UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **NIRIN WALLS,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Case No. 3:21-cv-00742-GCS** |
| ) | |
| **MICHAEL BEDNARZ, VENERIO** ) | |
| **SANTOS, LANA NALEWAJKA,** ) | |
| **JONATHAN GROTE, JAMES** ) | |
| **HODGE, DAVID HANKS, KORTNEY** ) | |
| **HOHMEYER, TERRI DEAN, BETH** ) | |
| **BRANNON, and SARAH** ) | |
| **GANIEANY,** ) | |
| ) | |
| **Defendants.** ) | |

<u>**MEMORANDUM & ORDER**</u>

**SISON, Magistrate Judge:**

Pending before the Court are Defendants' Motions for Summary Judgment. (Doc. 154, 163). Defendants Michael Bednarz ("Bednarz"), Terri Dean ("Dean"), Sarah Keller ("Keller"), Kortney Hohmeyer ("Hohmeyer"), and Venerio Santos ("Santos") filed their Motion for Summary Judgment and a Memorandum in Support on December 29, 2023. (Doc. 154, 155). The remaining Defendants, Beth Brannon ("Brannon"), Jonathan Grote ("Grote"), David Hanks ("Hanks"), James Hodge ("Hodge"), and Lana Nalewajka ("Nalewajka"), also filed a Motion for Summary Judgment and Memorandum in Support on January 12, 2024. (Doc. 163, 164). Plaintiff, Nirin Walls, filed a Response to Defendants' Motions for Summary Judgment on June 10, 2024. (Doc. 216); *see also* (Doc. 224). For the reasons delineated below, the Court **GRANTS** the Motion for Summary Judgment filed

by Defendants Brannon, Grote, Hanks and Nalewajka. (Doc. 163). The Court also **GRANTS** the Motion for Summary Judgment filed by Defendants Bednar, Dean, Keller, Hohmeyer, and Santos. (Doc. 154).

PROCEDURAL HISTORY

Plaintiff Walls, an inmate in the custody of the Illinois Department of Corrections ("IDOC"), filed this action pursuant to 42 U.S.C. § 1983 for alleged deprivations of his constitutional rights at Centralia Correctional Center. (Doc. 1). Broadly speaking, Plaintiff's Complaint, filed on June 28, 2021, concerns his course of treatment and care for schizophrenia and a seizure condition. (Doc 1); *see also* (Doc. 10, p. 2-4).

On August 19, 2021, the Court conducted a preliminary review of Plaintiff's Complaint pursuant to 28 U.S.C. § 1915A. (Doc. 10). The Court designated the following claims from Plaintiff's pro se Complaint:

> **Count 1:** Eighth Amendment claim against Dr. Bednar, Dr. Santos, HCUA Nalewajka, C/O Hodge, Nurse Hank, Nurse Hallmeyer [Hohmeyer], Nurse Dean, and Nurse Sarah for exhibiting deliberate indifference to Walls's serious medical needs related to his schizophrenia and seizure disorder.

> **Count 2:** Eighth Amendment claim against C/O Hodge, Lieutenant Grotte, and Nurse Brennan for exhibiting deliberate indifference to Walls's serious medical needs related to his injuries when he fell during a seizure.

> **Count 3:** Fourteenth Amendment claim against Dr. Bednarz for the involuntary administration of an antipsychotic drug.

(Doc. 10, p. 6). Count 1 proceeded against all Defendants, except for Hodge. *Id.* at p. 8. Plaintiff's claim against Hodge in Count 1 was dismissed without prejudice for failure to state a claim. *Id.* at p. 7. Counts 2 and 3 proceeded against the Defendants as noted above.

*Id.* at p. 8. However, Plaintiff's claim for injunctive relief was dismissed without prejudice. *Id.*

On January 24, 2022, the Court issued an initial scheduling order indicating that Defendants' dispositive motions on the issue of exhaustion of administrative remedies were due on March 24, 2022. (Doc. 74). Both sets of Defendants moved to withdraw the affirmative defense of failure to exhaust administrative remedies on March 24, 2022. (Doc. 77, 78). The Court granted Defendants' Motions on March 28, 2022. (Doc. 80). The Court then entered the merits scheduling order which set the deadline for dispositive motions for February 28, 2023. (Doc. 81). Motions for extensions of time were granted for both sets of Defendants – which allowed Defendants to file their Motions for Summary Judgment on December 29, 2023, and January 12, 2024. *See, e.g.*, (Doc. 151, 159).

**FACTUAL BACKGROUND**

*A.*    ***Plaintiff's Health History Prior to Transfer to Centralia***

Plaintiff was first diagnosed with a seizure disorder in 2002. (Doc. 164, Exh. 1, p. 23:1-9). Prior to Plaintiff's arrival at Centralia, Plaintiff was housed at Hill Correctional Center ("Hill"). (Doc. 155, Exh. 1, p. 65). On October 21, 2018, at Hill Correctional Center, Plaintiff was seen for a mental health appointment for schizoaffective disorder. *Id.* During this appointment, Plaintiff reported being sent to prison five times, each a result of coming off his mental health medications. *Id.* The mental health worker reported that Plaintiff had refused his shot of Haldol that day and that they had discussed "his significant history of psychotic symptoms and long time need for Haldol and Cogentin." *Id.*

Non-defendant Dr. Bautista saw Plaintiff at Hill on October 25, 2018, to address his complaints of seizures. (Doc. 155, Exh. 1, p. 4). She enrolled Plaintiff into a seizure clinic and ordered Depakote anti-seizure medications. *Id*.

Plaintiff also saw Defendant Dr. Bednarz multiple times via telemedicine for schizophrenia in early 2019. On January 10, 2019, Bednarz noted that Plaintiff had not received his Haldol shot "in over a month" because "he has trouble getting up in the morning." (Doc. 155, Exh. 1, p. 77). To address this issue, Bednarz indicated he would "renew injection and give HS dosing." *Id*. Bednarz saw Plaintiff again on March 25, 2019. *Id.* at p. 76. He wrote that "patient was to consider Abilify," but that Plaintiff "would like to keep medications the same." *Id*. Bednarz also reported that Plaintiff hears voices some days and does not hear voices some days. *Id*.

**B.    *Plaintiff's Initial Care After Transfer to Centralia Correctional Center (2019)***

Plaintiff was transferred to Centralia from Hill on May 8, 2019. (Doc. 155, Exh. 1, p. 15). The transfer sheet notes that Plaintiff was enrolled in the seizure chronic care clinic and that he was last seen at the clinic on November 20, 2018. *Id*.  The transfer sheet also indicated that Plaintiff was on Depakote for his seizures, Haldol for his schizophrenia, and Remeron. *Id*.

On May 10, 2019, Defendant Dr. Santos conducted a medication review and ordered the following medications for Plaintiff: Benztropine 1 mg tab – take 1 tablet by mouth at bedtime; Divalproex [Depakote] ER 500 mg tab – take 3 tablet(s) by mouth at bedtime; Haloperidol Dec (1ML) 50 mg/ml inj. – inject 150 mg (3ml)im at bedtime every 3 weeks; Haloperidol 5 mg tab – take 1 tablet by mouth at bedtime; and Mirtazapine 15

mg tab – take 1 tablet by mouth at bedtime. (Doc. 155 Exh. 1, p. 96). The order for Depakote was set to expire on November 5, 2019, with the remaining orders set to expire on June 8, 2019. *Id.*

Santos saw Plaintiff on May 28th, July 2nd, July 10th, and July 25, 2019, for complaints of low back pain. (Doc. 155, Exh. 1, p. 9,11,12,14). The records do not show any documentation of Plaintiff's complaints related to his seizure activity on these dates. At the July 25, 2019, visit, Plaintiff's labs were drawn to measure his Depakote levels in preparation for his next appointment at the seizure chronic care clinic. *Id.* at p. 10.

On August 22, 2019, Plaintiff saw Santos at the seizure clinic. (Doc. 155, Exh. 1, p. 92-93). Plaintiff reportedly voiced no complaints and indicated that his last seizure had occurred approximately one year ago. *Id.* at p. 92. Santos also noted that Plaintiff showed no neurological defects. *Id.* However, Santos noted that Plaintiff's Depakote levels were low, and that he refused to take Keppra (a type of seizure medication). *Id.* at p. 92-93. Santos identified Plaintiff as being a medication compliance risk, and he ordered that follow-up labs be drawn in one month to assess Plaintiff's Depakote levels again. *Id.* at p. 93. To raise Plaintiff's levels, Santos ordered that Plaintiff be responsible for taking Dilantin 300 mg once daily before bedtime. *Id.* While Santos worked at Centralia, it was his practice to change medication for seizure patients from Depakote to Dilantin if they had difficulty making it to the medication line. (Doc. 155, Exh. 2, p. 4). This is because Depakote is a controlled substance that cannot be kept by inmates in their personal property, whereas Dilantin is not a controlled substance and can be taken by the individual based on his own responsibility. *Id.*

After his transfer to Centralia, Plaintiff also continued to see Defendant Dr. Bednarz for his mental health care. On September 8, 2019, Bednarz noted that Plaintiff had been refusing his medications for the last month. (Doc. 155, Exh. 1, p. 69-70). Plaintiff reported that he was refusing his medications because he didn't need them. *Id.* at p. 70. At this appointment, Plaintiff denied symptoms of depression, but continued to refuse to take his medication even after Bednarz discussed the importance of taking it. *Id.* Bednarz discontinued Haldol, 15 mg, Rameron, 15 mg, and Cognetin, 1 mg. *Id.* However, Plaintiff's Haldol Decanoate, 150 mg, HS IM every 3 weeks was continued. *Id.*

Plaintiff saw Dr. Santos once again on September 23, 2019, to check on his follow-up labs for Depakote levels. (Doc. 155, Exh. 1, p. 8). Plaintiff's Dilantin levels were 6.7, which was lower than it had been at the previous lab draw. *Id.* Santos examined Plaintiff and saw no signs of ataxia or neurological defects. *Id.* Santos increased Plaintiff's dose of Dilantin to 200 mg twice daily and planned repeat labs in one month along with another follow-up appointment. *Id.*

Bednarz saw Plaintiff again on November 10, 2019. (Doc. 155, Exh. 1, p. 32). Bednarz noted that Plaintiff had "recently been taken off Remeron, Haldol (oral), and Cogentin" at his own request. *Id.* Bednarz also reported that Plaintiff stated he "does not want to take his Haldol Decanote" and "he is going to refuse it." *Id.* Additionally, Bednarz noted that Plaintiff denied symptoms of depression and anxiety; Plaintiff also noted sleeping well at night. *Id.* Plaintiff also reportedly denied symptoms from Haldol. *Id.* Bednarz elected to continue "IM Haldol" and noted that "if patient refuses will consider transfer to Dixon." *Id.*

Less than a month later, on December 8, 2019, Plaintiff was seen by Dr. Bednarz for another psychiatric evaluation. (Doc. 155, Exh. 1, p. 31). Bednarz reported that Plaintiff stated: "I don't need my medication." *Id.* Additionally, Bednarz noted that Plaintiff's family had supposedly been advising him to refuse his medications. *Id.* Bednarz felt Plaintiff was being "guarded" on exam and wrote that Plaintiff "would not consent to medication." *Id.* Bednarz discussed the risks of stopping the medications with Plaintiff. *Id.* Plaintiff reportedly verbalized to Bednarz that he understood the risks, but still wished to go off his medication. *Id.* Bednarz discontinued Plaintiff's Haloperidol Decanoate, 150 mg IM and noted that Plaintiff should be seen for a "well[-]being check." *Id.*

Plaintiff believes he began experiencing seizures after Santos changed his medication upon arrival at Centralia. (Doc. 1, p. 10). Plaintiff indicated that he began experiencing seizures overnight starting in early September 2019. *Id.* Plaintiff reportedly expressed concern to Santos about changing his medication distribution from being distributed daily by a nurse ("DOT") to having to be individually responsible for his medication ("KOP"). *Id.* at p. 9. Plaintiff specifically recalled that he experienced seizure activity in November 2019. *Id.* at p. 10. He reports that he told Dr. Santos that he felt the Dilantin was not working as well as the Depakote and that he was not mentally stable enough to remember to take his medication on his own recognizance. *Id.* at p. 11.

Around this same time, Plaintiff asserts that Dr. Bednarz coerced him into taking his Haldol shot again. (Doc. 155, Exh. 7, p. 115:25-116:21). Plaintiff claims that Bednarz threatened him by stating that mental health professionals would strap him down and force him to take the Haldol shot if he were transferred to Dixon Correctional Center. *Id.*

Bednarz also reportedly told Plaintiff that he was Court ordered to take the Haldol shot. *Id.* However, Plaintiff reported medical staff responded to his refusals to take the Haldol shot by asking him to sign a refusal form before he left the room without receiving the injections. *Id.* at p. 114:25-115:10.

## C.    *Plaintiff's Care at Centralia in Early 2020*

Dr. Bednarz saw Plaintiff on January 28, 2020, for a psychiatric evaluation. (Doc. 155, Exh. 1, p. 30). He noted that Plaintiff's Haldol had been discontinued at Plaintiff's request and that his mood had been "consistently good." *Id*. Plaintiff reported to Bednarz that he had "never heard voices." *Id*. When asked why he had been placed on Haldol, Plaintiff reportedly answered: "I told them I was hearing voices." *Id*. Plaintiff also reported to Bednarz that he had good family support, but that his family was against mental health treatment. *Id*. Plaintiff once again refused to consent to medication, but Bednarz noted that Plaintiff was "not a candidate for enforced meds at this time." *Id.*

Defendant Dr. Santos saw Plaintiff for chronic care-seizure clinic on February 26, 2020. (Doc. 155, Exh. 1, p. 94-95). Plaintiff reported to Santos that his last seizure had occurred in 2018, but that the onset of his seizures occurred in 2002. *Id*. at p. 94. Santos noted that Plaintiff was on Dilantin, had refused recent labs for his seizure clinic, and that his examination on that day was otherwise within normal limits. *Id*. at p. 94-95. Plaintiff claims he suffered from another seizure sometime in February 2020. (Doc. 1, p. 10-11).

According to Plaintiff's medication records, he was first given 120 capsules of Phenytoin (a substitute for Dilantin) on December 8, 2019. (Doc. 164, Exh. 3, p. 1). He was then given another 120 capsules to self-administer on January 16, 2020. *Id*. at p. 2. On

March 6, 2020, he was given another 120 capsules to self-administer. *Id*. at p. 3. Defendant Correctional Medical Technician/Licensed Practical Nurse Hanks recalled giving Plaintiff the March 6, 2020, medication pack. (Doc. 164, Exh. 4, p. 1).

**D.   *Plaintiff's April 7, 2020, Seizure***

Plaintiff reported having a seizure on April 7, 2020. (Doc. 155, Exh. 1, p. 5). Plaintiff recalls that he was in his bed and ended up in the floor. (Doc. 164, Exh. 1, p. 31:22-25). Plaintiff tried to get up but ended up near the toilet. *Id*. Plaintiff was on his back on the floor, but conscious when Defendant Correctional Officer Hodge came to Plaintiff's cell. *Id*. at p. 34:21-23; 34:6-8. Defendant Hodge was the first person to come to Plaintiff's cell, and Plaintiff estimates that he was on the cell floor for twenty-five to thirty minutes before Hodges arrived. *Id*. at p. 33:18-21. Plaintiff asserts that Hodge frequently failed to perform his 30-minute rounds of the cell house. (Doc. 1, p. 13).

Plaintiff recalls that before Defendant Hodge stopped at the cell, he walked past Plaintiff and signed a book at the end of the wing and then came back. (Doc. 164, Exh. 1, p. 34:21-25). Plaintiff remembers Defendant Hodge asking him if he was OK and if he could get up. (Doc. 164, Exh. 1, p. 33:8-17).  Plaintiff told Hodge that he hurt his neck and back. *Id.*  Plaintiff recalls that a code was subsequently called. *Id.*

Plaintiff then remembers Defendant Brannon coming to his cell with a wheelchair. (Doc. 164, Exh. 1, p. 35:20-36:1). Plaintiff recalls that he complained of back and neck pain. *Id*. Plaintiff also recalled that Hodge told the other Defendants about his seizures. *Id*. Plaintiff was then lifted by Defendants Grote and Hodge – one of them on each side of Plaintiff – trying to place Plaintiff in the wheelchair. *Id*. at p. 37:22-38:9. Plaintiff believes

he was dropped by Grote and Hodge; however, Grote and Hodge were able to get him successfully into the wheelchair. *Id*. Plaintiff admits that he believes Grote and Hodge did not drop him on purpose. *Id.* at p. 40:11-14. Once Plaintiff was in the wheelchair he was taken to healthcare where he was seen and placed on a 23-hour hold. *Id.* at p. 41:18-24.

Plaintiff was seen by a nurse in healthcare at 4:30 pm that same day. (Doc. 155, Exh.1, p. 3). Plaintiff told the nurse that he had experienced seizure activity at approximately 3:30 pm that day while walking. (Doc. 155, Exh. 1, p. 5). Plaintiff also stated that he lost consciousness while he experienced the seizure. *Id.* At 5:40 pm, while still in the healthcare unit, Plaintiff complained of "L[eft] sided neck pain. For the past twenty minutes." (Doc. 164, Exh. 3, p. 26). Plaintiff was provided with 200 mg of Ibuprofen to address his pain. *Id.* He was seen again at 11:16 pm and had no complaints. *Id*. at p. 27.

Plaintiff's outpatient progress note dated April 7, 2020, at 5:30 pm, provided further elaboration on Plaintiff's condition. (Doc. 155, Exh. 1, p. 6). The progress note indicated that Plaintiff's chief complaint was that he had a seizure that caused him to fall out of bed. *Id.* The note also indicated that Plaintiff was on DOT Dilantin 200 mg and stated that the doctor was contacted. *Id.* Plaintiff was discharged from temporary placement on April 8, 2020, following observation. (Doc. 155, Exh. 1, p. 24). The nurse noted no signs of acute distress, a steady gait, and no reports of seizure activity while Plaintiff was in observation. *Id.*

Plaintiff believes he ran out of medication prior to the seizure occurring and estimates that he had been without his seizure medication for ten days. (Doc. 1, p. 11-12). Plaintiff asserts that he had informed Defendant Nurses Dean, Keller, and Hohmeyer that

he was out of his seizure medication prior to the seizure occurring. (Doc. 155, Exh. 8, p. 7-8). Plaintiff also alleges that he alerted Santos that he needed a cell mate due to his seizure condition so that help could be summoned quickly. (Doc. 1, p. 13). However, Plaintiff claims Santos denied his requests. *Id.*

Plaintiff sued nurse Brannon because he believes Brannon should have ordered that Plaintiff be placed on a back board with a neck brace as opposed to a wheelchair. (Doc. 164, Exh. 1, p. 42:12-23).

Plaintiff named Defendant Nalewajka, who was the healthcare unit administrator at Centralia at the time of this incident, because he alleges he was not receiving his medications timely; however, Plaintiff admitted he does not believe Defendant Nalewajka was involved in renewing his medications. (Doc. 164, Exh. 1, p. 45:8-11).

E.     ***Plaintiff's Medical Care Provided for Seizures for the Remainder of 2020***

Dr. Santos saw Plaintiff to evaluate his back and neck pain on April 13, 2020, following his seizure. (Doc. 155, Exh. 1, p. 23). Santos observed Plaintiff ambulating without a limp with no reflex deficit and assessed him as having muscular aches and a history of seizures. *Id.* In response, Santos ordered Cogentin and Robaxin to treat Plaintiff's muscle spasms and recommended an increase in fluids. *Id.*

Santos followed up with Plaintiff on April 15, 2020. (Doc. 155, Exh. 1, p. 22). Plaintiff voiced no complaints at this encounter, and he appeared to be alert and in no apparent distress. *Id.* Santos planned to continue Robaxin and repeat Plaintiff's Dilantin level labs in one week. *Id.*

During a sick call on April 22, 2020, at 5:25 pm, Plaintiff reported that he had

recently had a seizure that caused immediate back pain, neck pain, and numbness in his toes. (Doc. 155, Exh. 1, p. 21-22). The nurse on call observed that Plaintiff had an "exaggerated slow gait," but found no signs of swelling, redness, bruises, or tenderness to touch upon exam. *Id*. at p. 21. Plaintiff self-reported to the nurse that he was experiencing a decrease in his range of motion. *Id*. The nurse referred Plaintiff for a doctor appointment. *Id*. at p. 22.

Santos saw Plaintiff for the referral appointment on April 24, 2020. (Doc. 155, Exh. 1, p. 19). Santos observed that Plaintiff was alert and in no apparent distress. *Id*. He provided Plaintiff with Naproxen to address his neck and back pain and planned to follow up with Plaintiff in six days. *Id*.

Plaintiff's back and neck pain were still unresolved on April 29, 2020. (Doc. 155, Exh. 1, p. 18). Santos observed that Plaintiff was alert and had no antalgic gait. *Id*. Santos planned an x-ray of Plaintiff's cervical and lumbar spine as well as a follow-up to discuss the x-ray results. *Id*.

The follow-up visit to review Plaintiff's x-ray results took place on May 8, 2020. (Doc. 155, Exh. 1, p. 17). Plaintiff complained of experiencing on and off back pain, but Santos observed Plaintiff ambulating without pain. *Id*. Santos assessed Plaintiff as having degenerative disc disease of the spine and advised Plaintiff about stretching exercises he could do, and otherwise instructed Plaintiff to continue following up as needed. *Id*.

Dr. Santos retired from Centralia as the medical director at the end of May 2020. (Doc. 155, Exh. 2, p. 6-7).

*F.      Plaintiff's Mental Health Care Provided for the Remainder of 2020*

Shortly after the April 7, 2020, seizure, Plaintiff was seen by Dr. Bednarz. On April 11, 2020, Bednarz reported in Plaintiff's psychiatric progress note that he had a seizure and referred Plaintiff to his primary care physician for follow-up care. (Doc. 155, Exh. 1, p. 28). Bednarz did not indicate that Plaintiff had any abnormal symptoms upon examination. *Id*.

Plaintiff continued to see Bednarz for his mental health care from May to July 2020. (Doc. 152, Exh. 1, p. 26-27). On June 21, 2020, Bednarz noted that Plaintiff was still refusing his medication, but that he was not a candidate for enforced medication. *Id*. at p. 25. Bednarz discussed with Plaintiff the possible negative side effects of being off his medication including an increased risk of suicide and worsening mental health symptoms. *Id*. Otherwise, Plaintiff reported that he was getting along well with his cellmate, that his mood had been consistently good, and that he was taking his Dilantin as proscribed. *Id*.

On July 20, 2020, Bednarz saw Plaintiff after he had served 10 days in segregation. (Doc. 155, Exh. 1, p. 41). Plaintiff expressed to Bednarz that he believed the correctional officers were retaliating against him for writing grievances. *Id*. Plaintiff also reported to Bednarz that he had been experiencing seizures in his sleep since April as well as auditory and visual hallucinations. *Id*. Plaintiff was still refusing medication at this time, and Bednarz recommended that Plaintiff consider taking Abilify. *Id*. Plaintiff reported that he would discuss taking Abilify with his mother. *Id*. The risks of Plaintiff being off his mental health medication was discussed again at this visit. *Id*.

Plaintiff saw non-defendant social worker Michelle Dulle on July 28, 2020, for an emergency referral mental health visit. (Doc. 155, Exh. 1, p. 40). Plaintiff claimed "I have a lawsuit on this place, and I feel them treating me like this is retaliation for it. I am filing grievances on these issues as well. I am not taking my Haldol anymore. I do hear voices, but the medication made me too drugged up to take seizure meds so I stopped." *Id.* Dulle observed that Plaintiff's speech was normal, his thoughts were coherent, and his judgment unimpaired. *Id.*

On August 2, 2020, Bednarz had a follow-up appointment with Plaintiff. (Doc. 155, Exh. 1, p. 38-39). Plaintiff reported that his mood had been more down recently and that he had received multiple disciplinary tickets. *Id.* at p. 38. Plaintiff also admitted to experiencing auditory hallucinations. *Id.* Plaintiff indicated that he had been unable to speak to his mother about the Abilify medication recommendation. *Id.* At the end of the session, Bednarz noted that Plaintiff "was agitated over his medical records." *Id.*

After the August 2, 2020, visit, Plaintiff filed a grievance regarding his interaction with Dr. Bednarz. (Doc. 155, Exh. 8, p. 4-5). Plaintiff complained that Bednarz had lied to him about a Court order for Plaintiff to take Haldol during a telemedicine appointment. *Id.* He specified that Dr. Bednarz had told him a Court had ordered that he take Haldol in response to his protests about taking the medication and would not remove the order for Haldol. *Id.* Plaintiff also alleged that Bednarz threatened to transfer Plaintiff to Dixon Correctional Center if he did not take his medication. *Id.* The Grievance Officer denied the grievance on October 8, 2020, explaining that Plaintiff was not on forced medication at this time and that Plaintiff had signed releases of refusal for his medications in August

and November 2019. *Id*.

Plaintiff saw licensed professional counselor Bonita Copland ("Copland") on August 3, 2020, where he discussed his August 2nd visit with Dr. Bednarz. (Doc. 155, Exh. 1, p. 37). Plaintiff informed Copland that Bednarz had told him that he needed to be on Haldol. *Id*. Plaintiff also reported that he hears voices and sees things – but that the "shot don't do nothing for none of that. The side affects [sic] make everything worser . . . can't stay awake, drool on myself. It's a tranquilizer. That . . . should be for animals." *Id*. Plaintiff also told Copland that Bednarz was lying to him and that he wanted to see a different psychiatrist. *Id*.

On August 5, 2020, Plaintiff saw Washington D. Cisco, LCSW ("Cisco") for a psychiatric evaluation. (Doc. 155, Exh. 1, p. 36-37). Plaintiff began the interaction with the acknowledgement that he had had been refusing to take his medication because he didn't like how it was making him feel. *Id*. at p. 36. Plaintiff then went on to ask "Did you see the Bull in the room when you came in? You [Cisco] caused it to go away." *Id*. Cisco identified Plaintiff's thought process as "illogical" with some indications of perceptual disturbances. *Id*. Plaintiff was admitted into mental health restrictive housing at this time. *Id.*

Plaintiff saw Dulle again on August 7, 2020. (Doc. 155, Exh. 1, p. 34). Plaintiff indicated that he needed to see internal affairs because he had previously been working for them, and that he was unsafe because it got out on the unit. *Id*. Plaintiff stated that he had not taken Abilify and that he would not take his seizure medication until internal affairs spoke with him. *Id*. He also reported that the "Dr." told him that if he did not take

his medication that he would force him to take his medications. *Id*. Plaintiff also told Dulle that he had lied to the doctor about not hallucinating. *Id*. Plaintiff said he was "seeing more things right now . . . [and that] the officer in seg scared away the clown the other day." *Id*.

Both Bednarz and Copland saw Plaintiff on August 9, 2020. Bednarz saw Plaintiff for a psychiatric evaluation while he was on crisis watch. (Doc. 155, Exh. 1, p. 46-47). Bednarz found Plaintiff to be "argumentative during exam and perseverates about being on crisis unjustly." *Id*. at p. 47. Plaintiff denied his mental illness while talking to Bednarz and threatened to deny treatment for his seizure disorder. *Id*. Bednarz reported that mental health would attempt to get a release to contact the Plaintiff's mother to gain support for medication compliance. *Id*. Copland also attended the same psychiatric evaluation. She noted that Plaintiff had stated he was never going to hurt himself or anyone else, and that he did not understand why he was on crisis watch. *Id*. at p. 48. Plaintiff stated that crisis watch was making him worse and that he had a seizure since being in the cell. *Id*. Plaintiff also refused to sign the release for mental health to contact his mother; he was also not receptive to treatment. *Id*.

Plaintiff reported having a seizure while he remained on crisis watch on August 10, 2020. (Doc. 155, Exh. 1, p. 49). Plaintiff refused his meal tray at 9:33 am that morning, and custody officer Krebs documented Plaintiff stating, "I can't get up I had a seizure." *Id*.

Social worker Michelle Dulle ("Dulle") saw Plaintiff on August 11, 2020, after he was removed from crisis watch. (Doc. 155, Exh. 1, p. 45). Plaintiff expressed to Dulle that

he did not believe he needed to be on crisis watch. *Id*. Plaintiff asserted that "people are trying to cover things because of the lawsuit [he] filed." *Id*. Plaintiff noted that he was not going to take any "psych meds" and stated that they made him feel worse than the illness. *Id*. He also reportedly stated that he was taking his seizure medications again and that was all the medication he was going to take. *Id*. Plaintiff was taken off 15-minute watch intervals and was placed on 30-minute watch intervals after consultation with Terri Schulte LCSW ("Schulte"). *Id*.

On August 13, 2020, Bednarz saw Plaintiff for a psychiatric appointment to discuss his medications. (Doc. 155, Exh. 1, p. 42-43). Plaintiff had been refusing to take his Abilify, but he asked that it continue being ordered because he would consider taking it after speaking with his mother. *Id*. Plaintiff reportedly understood and agreed that the benefits of the medication outweighed any risk. *Id*. Bednarz planned to continue the same medications but would discontinue them in two weeks if Plaintiff continued to refuse them. *Id*.

Plaintiff met with Bednarz again on August 16, 2020, after he had been released from segregation. (Doc. 155, Exh. 1, p. 81-82). Plaintiff requested that he be placed in protective custody due to a fear of gangs and interpersonal problems with correctional officers. *Id*. at p. 82. Plaintiff had spoken to his mother, and his mother did not believe in mental health treatment. *Id*. Plaintiff expressed that he did not want to take any mental health medications. *Id*. Bednarz noted that Plaintiff was not a candidate for enforced medication at this time. *Id*. Bednarz discontinued Abilify and Benadryl. *Id*.

Plaintiff met with Schulte on August 27, 2020, where he discussed his ongoing

concerns about the security staff and his belief that he was being retaliated against for writing grievances. (Doc. 155, Exh. 1, p. 80). Schulte expressed her belief that Plaintiff's issues with the security staff could be due to an increase in paranoia. *Id.* Plaintiff disagreed with Schulte's suggestion. *Id.*

**G.  *Deliberations about Plaintiff's Transfer from Centralia to Dixon Correctional Center***

On September 10, 2020, after Plaintiff had received a disciplinary report for intimidation, threats, and insolence, Schulte had an outpatient mental health meeting with Plaintiff. *Id.* Schulte reviewed the disciplinary report and determined that Plaintiff's mental health symptoms contributed to his behavior. *Id.* She planned to assess Plaintiff for referral to a residential treatment unit ("RTU") for care. *Id.*

Schulte saw Plaintiff again on September 21, 2020, for complaints that he was not receiving enough mental health care. (Doc. 155, Exh. 1, p. 78). Schulte told Plaintiff that psychotherapy and medication were recommended for his diagnosis, but Plaintiff replied, "medication is not for me, counseling is what works for me." *Id.* Schulte suggested that Plaintiff would benefit from an RTU, as it could provide an increase in programming. *Id.* Plaintiff agreed. *Id.*

On October 9, 2020, Plaintiff wrote an offender request stating: "please just put me in to go to Dixon please, I got these grievances back and you don't have to come back to talk to me. I'm good. This is why I'm staying back here period. Thanks for everything and I guarantee you the truth gone come out . . . also never been forced to take meds right, Bednarz know what he wrote." (Doc. 155, Exh. 1, p. 59).

Schulte met with Plaintiff on October 9, 2020. (Doc. 155, Exh. 1, p. 1032). Plaintiff discussed with Schulte why he no longer liked the Haldol injection, noting that "that had [him] drooling and sleeping all day. When [he] was in county [he] did not have any responsibilities. Here [he] [has] to be able to take [his] own seizure medication and [he] could not do it while on the Haldol." *Id*. Plaintiff reported auditory and visual hallucinations. *Id.* Schulte instructed Plaintiff on behavioral techniques to cope with the stress of perceived persecution. *Id*.

On October 11, 2020, Plaintiff was seen by Dr. Bednarz. (Doc. 155, Exh. 1, p. 61-62). Plaintiff was placed in segregation for fighting with another inmate. *Id*. Plaintiff reported that he felt safe in segregation and wanted to stay there. *Id.* Bednarz noted that Plaintiff was requesting to go to Dixon, and Bednarz planned to refer Plaintiff to Dixon/Joliet as he required a higher level of care. *Id.* Bednarz noted that Plaintiff was still refusing medications, but he was not a candidate for enforced medication. *Id*.

Schulte saw Plaintiff again on October 13, 2020, during which he refused to leave his cell until he was transferred to Dixon. (Doc. 155, Exh. 1, p. 60). Two days later, on October 15, 2020, Schulte recommended that Plaintiff be transferred to an RTU level of care as he would benefit from a structured setting that could provide more intensive services. *Id.* at p. 55. Schulte noted that Plaintiff's symptoms, including paranoid ideation, auditory and visual hallucinations, poor judgment, poor insight, and poor interpersonal skills had all negatively impacted his ability to function in the general population. *Id.* She also reported that Plaintiff did not meet the criteria for enforced medication, and that he had been proscribed Haldol, Remeron, and Cogentin, but that he had been refusing the

medications since August 2019 and his Haldol injection since November 2019. *Id.* at p. 57. In response, the psychiatrist started Plaintiff on Abilify, but Plaintiff only took the medication a couple of times then refused. *Id.* Bednarz concurred with Schulte's recommendation, citing the severity of Plaintiff's mental illness. *Id.*

Plaintiff was scheduled to be released from restrictive housing on October 16, 2020, but refused to leave. (Doc. 155, Exh. 1, p. 54). Plaintiff refused to come to the door until he was told that Schulte had a copy of his medical records for him to review. *Id.* Plaintiff reported being upset with Schulte, stating to her "you are ignoring what is going on here and I feel disrespected." *Id.* Specifically, Plaintiff expressed that he was upset with Schulte because she claimed he was not on enforced medication. *Id.* Schulte reiterated he was not on enforced medication at this time. *Id.* Plaintiff refused to speak to Schulte anymore after he had signed for the receipt of his medical records. *Id.*

On October 19, 2020, Plaintiff had another encounter with Schulte. (Doc. 155, Exh. 1, p. 52). Plaintiff refused to come out of his cell to meet with mental health. *Id.* Schulte assessed Plaintiff as having paranoid ideations and poor judgment. *Id.* She described Plaintiff's prognosis as poor. *Id.*

Plaintiff met again with Dr. Bednarz on November 5, 2020. (Doc. 155, Exh. 1, p. 87). Plaintiff expressed concern to Bednarz about his memory and believed it to be related to his seizure disorder. *Id.* Plaintiff reported experiencing auditory and tactile hallucinations. *Id.* Bednarz offered to speak to Plaintiff's mother about psychiatric medications, and Plaintiff indicated he would consider his offer. *Id.* Bednarz noted that Plaintiff was not a candidate for enforced medication at this time. *Id.* Negative outcomes

of refusing medication suggestions were also discussed. *Id.* Plaintiff verbalized his understanding, and he chose to remain off medications at this time. *Id.* Bednarz offered Plaintiff "Abilify, Geodon, Risperdal, and Zyprexa." *Id.* Plaintiff refused all these medications. *Id.*

On November 13, 2020, Plaintiff signed a "Notice of Impending RTU/Inpatient Transfer" form which advised him that because of his October 11, 2020, interview with the department physician or psychiatrist, it was recommended that he be transferred to Dixon for further evaluation and treatment. (Doc. 155, Exh. 1, p 85). The form advised Plaintiff that he had a right to appeal the decision or request a hearing, but Plaintiff did not request a hearing. *Id.*  During his conversation with Schulte over the form, Plaintiff emphasized that he wanted to go to Dixon. *Id.* at p. 86.

Schulte met with Plaintiff again on November 24, 2020. She noted Plaintiff's complaint that the doctors and staff had been negligent in letting him take his own seizure medication because he did not feel someone on those medications could function enough to take it on his or her own. (Doc. 155, Exh. 1, p. 84). Schulte told Plaintiff that many people could function independently on those medications, but if he had difficulties with sedation or other side effects, it should be discussed with the psychiatrist, and the psychiatrist could make adjustments. *Id.*

Bednarz met with Plaintiff for another mental health appointment on December 10, 2020. (Doc. 155, Exh. 1, p. 83). Bednarz described Plaintiff as paranoid upon exam and reported that he was experiencing auditory hallucinations. *Id.* Bednarz offered Plaintiff Geodon, Zyprexa, and Abilify. *Id.* Plaintiff refused all medication suggestions. *Id.* Plaintiff

did provide Bednarz with his mother's phone number and gave Bednarz permission to discuss his mental health and substance abuse history with her. *Id.* Bednarz also reported that Plaintiff had delusions of his mother as the warden of the prison as well as delusional thought content about his seizure medications and medical staff. *Id.*

On January 22, 2020, Plaintiff was seen by Schulte following a disciplinary report Plaintiff had received for damaging property. (Doc. 155, Exh. 1, p. 63). Plaintiff reported that he acted out because he wanted to be transferred from the facility. *Id.* Schulte wrote that she believed Plaintiff's mental health contributed to his behavior. *Id.*

### H.    *Plaintiff's Transfer to Dixon Correctional Center and Subsequent Treatment*

Plaintiff was transferred to Dixon on February 3, 2021. (Doc. 155, Exh. 1, p. 2-3). Plaintiff had a mental health encounter at Dixon on February 18, 2021, where he indicated that he had been tricked into coming to Dixon. (Doc. 155, Exh. 1, p. 89). Plaintiff was reportedly told he would be placed at Joliet. *Id.* During an encounter with psychiatrist Dr. Patel on October 4, 2021, Patel noted that he believed Plaintiff "might be trying to develop a lawsuit regarding being misdiagnosed or mistreated by his previous mental health providers." (Doc. 155, Exh. 1, p. 64).

Plaintiff believes his medical and mental health improved after transferring from Centralia to Dixon and improved even more after a subsequent transfer to Joliet. (Doc. 155, Exh. 7, p. 122:9-25 – 124:1-21).

### LEGAL STANDARDS

Summary judgment is proper when the pleadings and affidavits "show that there is no genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law." FED. R. CIV. PROC. 56(c); *Oates v. Discovery Zone*, 116 F.3d 1161, 1165 (7th Cir. 1997) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). The movant bears the burden of establishing the absence of a genuine issue as to any material fact and entitlement to judgment as a matter of law. *See Santaella v. Metropolitan Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997) (citing *Celotex*, 477 U.S. at 323). This Court must consider the entire record, drawing reasonable inferences and resolving factual disputes in favor of the non-movant. *See Regensburger v. China Adoption Consultants, Ltd.*, 138 F.3d 1201, 1205 (7th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). *See also Smith v. Hope School*, 560 F.3d 694, 699 (7th Cir. 2009) (stating that "we are not required to draw every conceivable inference from the record . . . we draw only reasonable inferences") (internal citations omitted). Summary judgment is also appropriate if a plaintiff cannot make a showing of an essential element of his claim. *See Celotex*, 477 U.S. at 322. While the Court may not "weigh evidence or engage in fact-finding[,]" it must determine if a genuine issue remains for trial. *Lewis v. City of Chicago*, 496 F.3d 645, 651 (7th Cir. 2007).

In response to a motion for summary judgment, the non-movant may not simply rest on the allegations in his pleadings; rather, he must show through specific evidence that an issue of fact remains on matters for which he bears the burden of proof at trial. *See Walker v. Shansky*, 28 F.3d 666, 670–671 (7th Cir. 1994), aff'd, 51 F.3d 276 (citing *Celotex*, 477 U.S. at 324). No issue remains for trial "unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party . . . if the evidence is

merely colorable, or is not sufficiently probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–250 (internal citations omitted). *Accord Starzenski v. City of Elkhart*, 87 F.3d 872, 880 (7th Cir. 1996); *Tolle v. Carroll Touch, Inc.*, 23 F.3d 174, 178 (7th Cir. 1994). In other words, "inferences relying on mere speculation or conjecture will not suffice." *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 407 (7th Cir. 2009) (internal citation omitted). *See also Anderson*, 477 U.S. at 252 (finding that "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]"). Instead, the non-moving party must present "definite, competent evidence to rebut the [summary judgment] motion." *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000) (internal citation omitted).

## DISCUSSION

The Court will address each of the arguments advanced by each respective Defendant in the two pending Motions for Summary Judgment. Neither set of Defendants contest that Plaintiff suffered a serious medical need in the form of his documented seizure condition. *See* (Doc. 155, p. 26); (Doc. 164, p. 11). Therefore, the Court will focus its analysis on whether the Defendants exhibited deliberate indifference while caring for Plaintiff.

### A.    *Defendant Hodge*

Plaintiff alleges that Defendant Hodge acted with deliberate indifference by passing his cell without stopping to check on him after he had experienced a seizure on

April 7, 2020. (Doc. 208, p. 6). Plaintiff reported that he was left lying on the floor for thirty minutes after his seizure before Hodge returned to check on him. *Id.* However, Defendants argue that the slight delay in response does not amount to deliberate indifference because Plaintiff's injury or pain was not exacerbated by the delay and the short delay was reasonable under the circumstances. (Doc. 164, p. 11-12). The Court agrees with Defendants' assessment.

A delay in treatment may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976). The length of delay that is tolerable depends on the seriousness of the condition and the ease of providing treatment. *See, e.g.*, *Grieveson v. Anderson*, 538 F.3d 763, 778-780 (7th Cir. 2008) (noting that guards could be liable for delaying treatment for painful broken nose by at least a day and a half); *Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007) (noting that two-hour delay in treatment for open dislocated finger for no medical reason stated a claim against a prison doctor for deliberate indifference). Even brief delays in providing care may be unconstitutional in certain circumstances. *See Bass by Lewis v. Wallenstein*, 769 F.2d 1173, 1183 (7th Cir. 1985) (holding that a fifteen-minute delay in treating a cardiac arrest may violate the Eighth Amendment).

In this case, Plaintiff was conscious on the ground after experiencing his seizure on April 7, 2020. (Doc. 164, Exh. 1, p. 32: 18-20). Plaintiff admits that he did not call out to Hodge after his seizure when he first passed by his cell to indicate that he was in distress. (Doc. 164, Exh. 1, p. 34:9-11). So, there is no evidence to indicate that Hodge knew that

Plaintiff was in distress. At best, all that could be said was that Hodge did not initially notice him the first time, which would be nothing more than mere negligence. When Plaintiff was still on the floor the second time Hodge passed by Plaintiff's cell, Hodge asked Plaintiff if he was ok. (Doc. 164, Exh. 1, p. 33:8-17). When Plaintiff responded that his neck and back hurt, Hodge responded by calling a medical code. *Id.* Plaintiff has not pointed to any evidence that the thirty-minute period caused him any suffering or exacerbated his neck or back injury. Accordingly, the Court finds that there are no facts in the record that would allow a jury to conclude that Hodges's actions amounted to deliberate indifference.

**B.**      *Defendants Hodge, Brannon, and Grote*

Plaintiff also alleges that Hodge, Brannon, and Grote engaged in deliberate indifference when Hodge and Grote (under the direction and supervision of Brannon) dropped him while attempting to place him in a wheelchair after the April 7th seizure. Plaintiff asserts that it was an ordinary practice at Centralia for inmates who complained of back and neck pain or experienced a seizure to be placed on a backboard with a neck brace. According to Plaintiff, the Defendants' failure to follow this practice amounted to deliberate indifference. (Doc. 208, p. 9-11). Defendants assert that there is no evidence in the record to demonstrate that Defendants Grote or Hodge purposefully dropped Plaintiff. (Doc. 164, p. 14). Moreover, Defendants argue that Defendant Brannon, a nurse, appropriately used her professional judgment to determine that Plaintiff could be transported to the healthcare unit via wheelchair. *Id.*

Deliberate indifference requires recklessness, "something more than negligence," but "less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer v. Brennan*, 511 U.S. 825, 826 (1994). Said another way, the subjective element requires more than negligence, and it approaches intentional wrongdoing. *See Burton v. Downey*, 805 F.3d 776, 784 (7th Cir. 2015). Here, Plaintiff can only establish possible negligence against the Defendants. Plaintiff weighs over 300 pounds. *See, e.g.*, (Doc. 155, Exh. 1, p. 6) (noting that Plaintiff weighed 328 pounds on April 7, 2020). Certainly, there was a possibility that Defendants Grote and Hodge would drop him because he is a larger individual. In any event, Plaintiff conceded that he could not say that Defendants Grote and Hodge purposefully dropped him. (Doc. 164, Exh. 1, p. 40:11-14).

As to Defendant Brannon, she is a nurse. The professional judgment standard applies to the Court's assessment of her conduct. For deliberate indifference, a medical provider's treatment decision must radically depart from accepted professional judgment, practice, or standards such that a jury could reasonably infer that the decision was not actually based on professional judgment. *See Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662-663 (7th Cir. 2016). In other words, the treatment must be found to be so blatantly inappropriate that it is divorced from any medical judgment. *See Anderson v. Randle*, No. 11-1890, 451 Fed. Appx. 570, 572 (7th Cir. Nov. 23, 2011). Plaintiff has not asserted that the mode of transport selected by Brannon was what caused him additional neck and back pain. Rather, he asserts that the pain was caused by Grote and Hodge

dropping him. Brannon, using her professional judgment, only determined that Plaintiff's condition did not warrant the use of a neck brace or backboard for transport. At most, Brannon may have been negligent, perhaps mistakenly concluding that Defendants Grote and Hodges were capable of lifting Plaintiff into the wheelchair, but nothing more can be ascertained from the facts in the record.

Lastly, Plaintiff's assertion that the three Defendants failed to follow an established Centralia policy is also insufficient for the Court to find that Brannon, Hodges, or Grote were deliberately indifferent in how they transported Plaintiff to the healthcare unit. Even if there is a policy at Centralia addressing how inmates with neck and/or back injuries following a seizure are to be transported, violation of a prison policy in and of itself does not establish a constitutional violation. *See, e.g.*, *Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir. 2003) (stating that "42 U.S.C. § 1983 protects plaintiffs from constitutional violations, not violations of state law, or in this case, departmental regulations . . . ."). Because Plaintiff has only alleged facts amounting to possible negligence on the part of the three Defendants, their disregard of a hypothetical policy, without more, does not amount to deliberate indifference.

### C.    *Defendant Nalewajka*

Plaintiff asserts that Nalewajka was deliberately indifferent because, as a "healthcare supervisor who keeps track of all records . . . [it is her] role to make sure all medication is being tracked and filled properly." (Doc. 208, p. 19). Defendants point out that Nalewajka did not treat Plaintiff nor was she involved in renewing Plaintiff's

medication. (Doc. 164, p. 13). Plaintiff acknowledged these facts as true in his deposition. *See* (Doc. 164, Exh. 1, p. 45:8-11). Given Plaintiff's admission, the Court finds that Nalewajka could not have been deliberately indifferent in Plaintiff's care due to her lack of involvement.

**D.    *Defendants Hohmeyer, Dean, and Keller***

Plaintiff alleges that Defendant Nurses – Hohmeyer, Dean, and Keller were deliberately indifferent to his seizure condition because he informed them he was out of medication in April 2020, but they took no action. (Doc. 208, p. 24). In response, the Defendants assert that they did not have the authority to change Plaintiff's medication order. (Doc. 155, p. 28).

During March and April 2020, Plaintiff was receiving his medication KOP (responsible for taking on own) because he was previously non-compliant in the DOT medication line, where he would receive his seizure medication from nurses. (Doc. 155, p. 6). Plaintiff reportedly informed the three Defendants at some point in April 2020 that he was out of seizure medication, likely because he did not take the medication as directed. The three nurse Defendants were only responsible for distributing Plaintiff's blister packs of medication to him. They were not responsible for ensuring Plaintiff took his medication as directed. As such, the Defendants' conduct can only be said to amount to negligence because Plaintiff did not indicate to the Defendants that he was experiencing any seizure activity while being out of his medication. *See, e.g.*, *Gayton v. McCoy*, 593 F.3d 610, 623 (7th Cir. 2010) (finding a nurse not informing a physician that plaintiff was not delivered his chronic heart failure medication as directed was only

negligent). Like in *Gayton*, at no time did Plaintiff complain to the three nurses that he was experiencing any harm because he was not taking his medication as directed. Had Plaintiff done so, the nurses' failure to inform his treating physician may amount to deliberate indifference. As this is not the case, the Court finds that Defendants Hohmeyer, Dean, and Keller did not act with deliberate indifference.

### E.    *Defendant Santos*

Plaintiff claims that Dr. Santos exhibited deliberate indifference by failing to respond to Plaintiff's complaints about the delivery method of his medication prior to his April 2020 seizure. (Doc. 208, p. 20). Defendants argue that Santos responded to Plaintiff's medical needs by changing his prescription delivery method as needed. (Doc. 155, p. 27). The record shows that Santos changed the medication delivery plans, not necessarily in response to Plaintiff's expressed preferences, but in accordance with his own professional judgment.

A disagreement about a doctor's medical judgment about the proper choice of treatment – even a disagreement between two medical professionals – is not enough to establish deliberate indifference. *See Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). Rather, Plaintiff must show that the medical professional's treatment "is such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *McGee v. Adams*, 721 F.3d 474, 481 (7th Cir. 2013) (quoting *Roe v. Elyea*, 631 F.3d 843, 862-863 (7th Cir. 2011)). As a medical professional, Santos is afforded "deference in treatment decisions unless 'no minimally competent professional would have so

responded under those circumstances.'" *Pyles,* 771 F.3d at 409.

Santos indicates that he changed Plaintiff's medication from DOT Depakote to KOP Dilantin on August 22, 2019, because Plaintiff had been non-compliant with Depakote and Santos believed Plaintiff might have more success with medication compliance by being afforded the opportunity to take the medication on his own schedule. (Doc. 155, Exh. 2, p. 4). Plaintiff's Dilantin levels rose from 6.7 to 19.0 from September to October 2019. (Doc. 155, Exh. 1, p. 8); (Doc. 155, Exh. 1, 7). When Santos saw Plaintiff next in February 2020, Plaintiff refused his seizure clinic labs. (Doc. 155, Exh. 1, p. 94-95). He also informed Santos at this time that he had not experienced a seizure since 2018. *Id.* Accordingly, the Court cannot find medical evidence in the record to find that Santos knew that Plaintiff was experiencing any seizure activity prior to April 7, 2020. Thus, the Court cannot find that Santos acted with deliberate indifference while caring for Plaintiff.

**F.      *Defendant Bednarz***

Plaintiff alleges that Dr. Bednarz forced him to continue taking the psychotropic medication Haldol through 2019. (Doc. 208, p. 42-43).  Specifically, Plaintiff asserts that Bednarz told him that he was court ordered to take the Haldol shot. *Id.* Additionally, Plaintiff contends that Bednarz threatened him with a transfer to Dixon if he did not consent to his Haldol shot. *Id.* Plaintiff cites to a facility grievance – Grievance No. 20-8-9 - that he wrote about his interactions with Bednarz as support for his deliberate indifference claim. (Doc. 208, p. 116). Defendants assert that Plaintiff only characterized Bednarz's attempts as "coercion." (Doc. 155, p. 29-31). Moreover, Defendants note that

Bednarz's charting consistently indicated that Plaintiff signed medication refusal forms for Haldol and that Bednarz never identified Plaintiff as a candidate for forced medication. *Id.*

Under the due process clause of the Fourteenth Amendment, a competent person has a liberty interest in refusing unwanted medical treatment. *See Cruzan by Cruzan v. Dir. of Missouri Dept. of Health*, 497 U.S. 261, 262 (1990). This right extends to prisoners who may refuse forced medical treatment while incarcerated. *See Knight v. Grossman*, 942 F.3d 336, 342 (7th Cir. 2019) (citing *Washington v. Harper*, 494 U.S. 210, 221-222 (1990)). Like an analysis under the Eighth Amendment, the Fourteenth Amendment requires a prisoner to prove that the defendant acted with deliberate indifference. However, the Fourteenth Amendment inquiry differs in that it focuses on whether the defendant was deliberately indifferent to the prisoner's right to refuse medical treatment. *Knight,* 942 F.3d at 342. "Neither negligence nor gross negligence is enough to support a substantive due process claim, which must be so egregious as to 'shock the conscience.'" *Id.* (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 848-849 (1998); *McDowell v. Village of Lansing*, 763 F.3d 762, 766 (7th Cir. 2014)).

The Seventh Circuit has held that a defendant is deliberately indifferent to an inmate's right to refuse treatment if he or she "subjectively knows" that the inmate did not consent to the treatment. *Knight,* 942 F.3d at 342. However, "[a] prisoner's right to refuse medical treatment cannot be infringed by a prison regulation that is 'reasonably related to legitimate penological interests.'" *Id*. (internal citations omitted) (noting common example is when forced medication is needed to avoid the spread of contagious

disease or quell disruptive behavior). Where a defendant merely attempts to persuade an inmate to take medication, this does not amount to a constitutional violation. *See Walls v. Thompson*, Case No. 22-cv-01099, 2023 WL 3726753, at *4 (S.D. Ill. May 30, 2023) (noting that Defendants who "attempted" to try and force Plaintiff to take the mental health medication by telling him he would not be released from suicide watch until he took the medication did not amount to deliberate indifference).

Here, Plaintiff admits that he was not physically forced to take the Haldol medication. (Doc. 157, Exh. 7, p. 116:8-21). Plaintiff admitted that he walked out of the room where the unidentified nurses planned to administer the shot. *Id*. The nurses did not attempt to forcibly hold Plaintiff down to administer the medication. *Id*. They allowed Plaintiff to walk away and accepted that he refused the medication. *Id*. Plaintiff's medical records show that Plaintiff refused Haldol numerous times and that he was not a candidate for forced medication. *See, e.g.,* (Doc. 155, Exh. 1, p. 70, 32, 30).

Moreover, the evidence Plaintiff points to as demonstrating "coercion" does not meet the standard for deliberate indifference. Like Plaintiff's previous case mentioned above, Bednarz may have been attempting to persuade Plaintiff to take the Haldol injection by indicating that he would be transferred to Dixon if his mental health symptoms worsened. Relaying this information to Plaintiff, however, actually served to inform Plaintiff of Bednarz's possible treatment plan such that Plaintiff could make an informed decision about his mental health treatment.

As to Bednarz conveying to Plaintiff that a court order required him to take medication, this may also have been another potential step in his treatment plan. In any

event, Bednarz could not "forcibly" give Plaintiff the Haldol shot on the alleged date because Bednarz saw him via telemedicine. (Doc. 208, p. 116). In response to Grievance No. 20-8-9, Schulte responded that Plaintiff was not on forced medication at this time, and that Plaintiff could continue to refuse medication by notifying the nurse of the refusal and signing another refusal form. *Id.* As it is clear from the record that Bednarz merely attempted to persuade Plaintiff to comply with his recommended course of psychiatric treatment, the Court finds that Defendant Bednarz did not act with deliberate indifference.

## CONCLUSION

For the reasons outlined above, the Court **GRANTS** the Motion for Summary Judgment filed by Defendants Brannon, Grote, Hanks, and Nalewajka. (Doc. 163). The Court also **GRANTS** the Motion for Summary Judgment filed by Defendants Bednarz, Dean, Keller, Hohmeyer, and Santos. (Doc. 154).

**IT IS SO ORDERED.**

**DATED:  September 30, 2024.**

Digitally signed by
Judge Sison
Date: 2024.09.30
17:56:33 -05'00'

**GILBERT C. SISON**
**United States Magistrate Judge**